We'll turn to the next case, In Re. Application of Gorsoan. Let me just make sure we have everyone on who's on the case. Okay, we'll hear from, Ms. Shapiro, are you going first? Yes, Your Honor. Thank you, and may it please the Court, this is Alexandra Shapiro, and I represent intervener Shanna Bullock on this appeal. In this appeal, Gorsoan asked the Court to endorse an unprecedented expansion of Section 1782. The rule that Gorsoan advocates would allow any party to an ongoing foreign proceeding to obtain 1782 discovery for the sole purpose of what Gorsoan terms non-adjudicative asset identification. In other words, regardless of whether the information sought can be used to obtain a ruling in the foreign proceeding. This incredibly broad interpretation defies the text of the statute and conflicts with Supreme Court and Second Circuit precedent interpreting 1782. Gorsoan's proposed rule would impose vast new burdens on federal district courts and businesses and individuals in the United States who may have records related to a foreign litigant's assets. That is simply not the law. Counsel, hasn't 1782 been consistently expanded both by Congress and in judicial proceedings to get closer to the extraordinarily broad discovery rights that there are in domestic ones? Isn't that really where that law has been going? Well, I disagree with that, Your Honor. I understand that the statute was amended several decades ago. But the statutory text clearly states that the discovery is only permitted if it is for use in a proceeding before a foreign tribunal. And this court is very carefully circumscribed. So isn't the question before us whether this was to help that foreign proceeding or whether it was simply to find out where the money was so that they could get at it? And that, while it sounds like a question of law, could be described almost as a question of fact in this case. And so my question is, how much deference should I owe to the district court's judgment on what was really going on here? Because it seems to me that that's a question. What was going on here? Were they looking, and I'll ask that same question to opposing counsel, were they looking just for the money, in which case this was not in aid, or were they doing something that would aid the foreign proceeding? Well, Your Honor, a couple of points. First of all, it's crystal clear under this court's precedence that this is a question to be reviewed de novo here, number one. Number two, there is a very serious legal question, as Your Honor indicated, as to whether the statute may be used simply to identify assets. And they've asked this court to endorse a rule that non-adjudicative asset identification is sufficient. Now, having said that- Can the identification of assets be used also to prove the fraud? I mean, you know, helping show that indeed there was fraud and fraudulent transfer, for example? Or is that not alleged in this case? Not in connection with this application that is before this court now. And I want to make a couple of points about that. Number one, Gorson never alleged that that was the use for which it was seeking these assets from Ms. Bullock's family members and associate. On the contrary, they asserted that it was for the same purposes in their 2013 separate application, which was clearly asserted to be directed at the merits, as to which the vast majority of the requests related to merits, and the two requests that related to assets were clearly- Those requests were overlapped with the merits. There was a different timeframe that was relevant for the underlying fraud. Here, by contrast, Gorson explicitly admitted, as the district court pointed out at SPA 14, that this discovery is unlikely to bear on the fraud itself. So we have a concession on that point, which the district court took to be accurate. They tried to modify that. Ms. Shapiro, I want to give you an opportunity to tell us why we shouldn't be persuaded. But if I understand it correctly, they now try to stitch together the fact that the merits proceeding in Cyprus is not concluded, and they use that to distinguish this case from some others that had concluded the merits determination. So they start with that as number one. Number two, that there is possible contempt of a prior order of the Cyprus court requiring disclosure and freezing of certain assets, which they say, if not complied with, would support a contempt citation, and that a contempt citation might limit their ability to offer defensive evidence on the merits. That would seem to be an argument that, with what Judge Calabresi has described as the increasingly expansive view of use in foreign proceeding, might persuade. But I want to hear you as to why it shouldn't in this case. Help me out. Yes, Your Honor. Well, let me take the first part. With respect to what I think the first part of your question was, the fact that there happens to be an ongoing foreign proceeding is not sufficient for an applicant to justify any discovery, including here mere asset identification, which they concede is a non-adjudicative purpose. I understand that, but the case is not as adverse to them as those in which merits had already been decided. And the only thing left is the satisfied judgment. If I can just expand on that. Please. I want to talk a little bit about the case law and the text of the statute. The text of the statute says the discovery has to be, quote, for use in a proceeding before a foreign tribunal. And this court has repeatedly held that that means that it has to be something that can be injected into the foreign proceeding in order to gain some advantage or increase the chances of obtaining a favorable ruling. So it can't just be something like what we have here, which is an apparent attempt to identify assets that might hypothetically satisfy a judgment if they were ever to procure one in the foreign proceeding. That's number one. Number two, with respect to the so-called contempt rationale, if we took that on face value, it would open the floodgates and anyone could casually claim the vague possibility of contempt in order to get a U.S. court to issue discovery like this. And this court has made clear that notwithstanding the expansion of the statute, that district courts must ensure that it's for use in a proceeding that's within reasonable contemplation. The Supreme Court in Entel talked about the need for a dispositive ruling being within reasonable contemplation. And here, what we have is essentially a pretext. This order from the Cyprus court was issued in 2013. They've had eight years. They've never pursued a contemplation. When you go back to saying it is essentially a pretext, you're going back to saying that this is a question of fact. You know, if you previously were arguing that certain hard lines should be drawn as a matter of law, and if that is so, we have de novo jurisdiction. But if the question is, in an uncertain situation, was this pretextual or real, that starts to look like a question of fact. This court has been clear that the question of whether a proceeding is within reasonable contemplation is to be reviewed de novo. And if you look at the certain funds case, the appellate court talked about the five-year delay. We review it de novo, but the question is, we review it de novo on the basis of facts found by the district court. And I'm not saying this is a factual issue, but it is a funny kind of a thing when you say, well, they were doing it for reason A rather than for reason B. And that starts looking very factual to me. I understand, Your Honor, and perhaps pretext wasn't the right word. And let me just state undisputed facts that are in the record below that no one can possibly argue about. Number one, this, as I mentioned, the order was issued eight years ago. Gorson has never pursued it since in recent years. In its 2018 application, made no mention of this rationale. And, indeed, never in the district court proceedings ever even made an affirmative representation that it would, in fact, pursue contempt there. And, indeed, the district court's discussion simply points to a transcript citation about the possibility that a finding of contempt could be made. There's no representation ever that they would actually have a valid contempt motion. And, indeed, I think it's highly telling that in the appellate brief, Gorson has run away from this rationale and instead is urging this court to adopt this incredibly broad rule that would allow any party to obtain nonadjudicative asset identification with 1782. Well, let me see if I understand the argument that they're making and give you an opportunity to respond to it. I gather they're saying that if they can find out what assets existed or were transferred within this family and then demonstrate that they were not identified pursuant to the Cyprus order, they're going to be able to argue contempt. The point is they don't have those facts now. And the sense that they're not just fishing might be supported by the record reference to the defendant having sold the Long Island property shortly before declaring in her deposition that she had no assets. So, to that extent, I'm not sure that they would have no basis for pursuing this in order to support a contempt that they think has occurred here. Why is that not sound? Well, that's not what they represented below. And at the time of the application, which is what certain funds says is the point for determination, the claim was that these subpoenas were seeking information that related directly to the merits of the Cyprus litigation, whether the fraud was committed. And so that just simply wasn't the basis. And this court has said that has held in certain funds that one has to look at the time of the application. Why don't you finish up? Because you're way over your time. And then Mr. Craig also is going to argue some of the same points. His argument is completely separate, just to be clear. But if I could just make one final point in response to Judge Radji's question. The Cyprus order included an order for discovery of these assets that was supposed to be provided within 14 days. So to the extent one is looking at it from that point of view, this is a motion that if it was valid in Cyprus could have been brought eight years ago. And so if the court accepts it, it would open the floodgates to many, many other situations in which people simply seek assets identification under the guise of a theoretical contempt motion. Thank you. Thank you, Mr. Craig. Good morning, Your Honors. I represent Respondent Stuart Sunlin. And as Ms. Shapiro noted, I will present oral argument on the Fifth Amendment issues on behalf of all respondents. Gorsun alleges that Jana Bullock has laundered money in hidden assets in the United States and across the world. Respondents were targeted for discovery about those assets. And Gorsun has argued that the documents sought are necessary to determine respondents' quote, involvement in Bullock's fraudulent schemes. The mere possession of any such documents would implicate respondents in Bullock's alleged wrongdoing and would provide a link in the chain of evidence needed to potentially prosecute respondents for a range of financial crimes. Respondents thus asserted the act of production privilege. That assertion should be upheld, and we think the district court should be reversed. The district court found that respondents' assertion was insufficiently particularized because they did not assert the privilege on a document-by-document basis. But document-specific objections are not required under binding Fifth Amendment precedent. And the district court's holding would effectively require respondents to surrender the very- Some courts have said that it must be specific to each document. We have not gone that far. But that wasn't what the district court held, wasn't it? Didn't it say that there just wasn't enough specificity generally and so that this was premature? Isn't that, without going as far as other circuits have gone, something which makes a fair amount of sense? Your Honor, the district court's sort of, on Special Appendix 28, it faults the respondents for the lack of particularized reasoning. But that followed after it already had made clear that what it was looking for was an objection to a specific document. And that certainly is something reflected in some of the cases that Gorson cites. But those cases are all non-binding. The lead case that Gorson relies on is from the District of Rhode Island Bankruptcy Court. None of those cases attempt to grapple with the precedent that binds this court or even attempts to explain how a document-specific process could even work in practice and preserve the privilege. So there certainly is a rationale for requiring an explanation. We don't dispute that there has to be an explanation provided. But why isn't this premature? Why isn't this premature? Why shouldn't we wait and see to what the actual question, assuming that we don't decide differently on the whole thing, but that it does come down to why don't we wait until we see what they're actually asking? Well, Your Honor, if you look at the final paragraph on Special Appendix 28, the district court makes clear how the process will play out from here in its view. And it directs the respondents to first meet and confer about issues of scope and burden with the other side. And only after that could document-specific objections be made. At the end of that process, there will be nothing left intact of respondents' Fifth Amendment rights. And so as long as the district court's decision stands and is not vacated, this document-specific requirement will apply to respondents. And there's just no way that the respondents— But why couldn't that issue be addressed in the meet and confer? You meet and confer, and your side says there are some documents that are concerning in this respect and talk generally about it and then try to resolve it before you get to the issue of whether, in fact, the Fifth Amendment privileges appropriately invoke. Two responses to that, Your Honor. First, in the meet and confer with Ms. Donovan, we couldn't try to sort of revise the district court's ruling about what it was looking for for the privilege to be sustained. But second, I think there's, you know, in a meet and confer, there's always a process, even if it's about scope or burden, there's a process of saying, you know, you can't have this, but we will give you this, and you attempt to reach compromise. There's no way to have that discussion without confirming or implying the existence of responsive documents. As I stated at the outset, the mere possession of any responsive documents here has the potential to incriminate. And so I think that the process that the district court mandated would not be the rights in fact. All right. Anything else? If there's no further questions, I'll save my remaining time for rebuttal. And, Mr. Marmer, you're there in case you have questions. Are there any questions for Mr. Marmer? If not, then we'll turn to Ms. Donovan. Thank you, Your Honor. Good morning, and may it please the court. My name is Caroline Donovan, and I'm here today on behalf of the petitioner in the lower court matter and the appellee, Gorsan Limited. Nothing subject to argument today is novel. First, Gorsan sought discovery from Johnna Bullock since 2013, and that asset discovery or the asset discovery that's now sought from the respondents derives entirely from that earlier sought asset discovery. Second, Section 1782 has long allowed discovery of assets, including where, as here, such discovery can demonstrate an individual's noncompliance with a freezing order abroad. And third and finally, the Fifth Amendment requires that the respondents do more to substantiate their risk of incrimination than they've done here. Wasn't any and all fraud and contempt and all of those things sufficiently already shown so that this adds nothing to the Cyprus proceeding? I mean, yeah, it would be another finding, but wasn't there all that could possibly affect that proceeding already there? Respectfully, I disagree. We have evidence, and this is at page 341 of the appendix. That's the transcript before Judge Abrams. What this additional evidence proves is the actual and explicit noncompliance with the freezing and disclosure order. Ms. Bullock has refused to participate or, excuse me, has appealed the freezing and disclosure order abroad in Cyprus. And she has refused to provide the compilation, the list of her assets that exceed 10,000 euros. So, yes, there is an established fact that Ms. Bullock has not complied with that order. We have not yet been able to tell the Cyprus court. These are all the myriad ways in which she has acted. You're acknowledging that the information is sought for noncompliance to prove noncompliance with the freeze order. Does that relate? Does that go to the merits for use in an adjudicated capacity, or is that something different? It does. And we put in that evidence through the declaration of an attorney in Cyprus, the Nicolaou Declaration. And that's at Appendix 309, I believe is the correct size, paragraph 8. The fraud, the alleged fraud took place 12, 15 years ago. Some of the assets you're seeking are from one of the respondents who was seven years old at the time. How do her tax records or her financial records help prove the fraud that took place when she was seven years old? They don't prove the fraud. Excuse me. They're not used to prove the actual fraud with the Moscow region bonds. What they prove is noncompliance. And Judge Raju was pointing at this earlier. There are sanctions available on approving of contempt in Cyprus. And those sanctions include a decision that Ms. Bullock cannot assert defenses. So, essentially, because we could establish Ms. Bullock's noncompliance with the freezing and disclosure order abroad with this discovery from the respondents, we're then able to go to the court in Cyprus. We're then able to preclude Ms. Bullock from asserting this defense. And that goes to the merits. But I want to step back. Let me interrupt you a moment. You can make that argument in Cyprus now. Indeed, you could have made it for years that there hasn't been compliance. And, therefore, there should be evidentiary sanctions for this asset discovery to do that. And that's what raises suspicions about what your real motivation is here. Am I wrong in thinking that you could have argued noncompliance for years? So, we have sought a contempt. We have moved for contempt in Cyprus. But you've withdrawn that. You withdrew that. And we explicitly premised that withdrawal, and we've reserved our rights to renew that contempt motion on the basis of discovery established in this proceeding. And that's the important – not this proceeding. That doesn't answer Judge Raju's question. That doesn't answer Judge Raju's question at all. Judge Raju's question is, did you already have what you needed to claim noncompliance in a way that would affect the Cyprus proceedings? And what does this add except another instance of what is already there and would get you what would affect those proceedings? That was her question. Talking about what you gave doesn't answer that. So, could you try to answer that? I will. What this discovery would inject into the Cyprus proceeding and what is different than what has already been established in Cyprus is specific evidence of assets that Ms. Bullock has alienated. As any trial court can appreciate, the sanctions vary according to the level of proof that is put in. If we can put in proof that establishes that Ms. Bullock, in fact, alienated vast amounts of money to her mother, to her daughters, to Mr. Sundlin, then that makes the determination easier and more likely by a Cyprus court that Ms. Bullock, in fact, is in contempt. Not simply that she's refusing to answer. She is refusing to answer the freezing and disclosure order and she has appealed it. We'd like to put in. So, what you're saying is that contempt is a mighty flexible thing. There's almost no contempt, little contempt, big contempt, contempt that go directly. And you are claiming, and this is a key point, that the Cyprus court's case will be affected by the level and type of contempt. Now, what do you bring in to show that that is what happens in cases of this sorting Cyprus? When you brought in that contempt can bring about certain things, but what do you bring in to show that this level of contempt and this type of contempt would affect that case? So, I'd go back to the Nicolaou Declaration, and that says that the court can allow sanctions. And I think it has to be, and this is as much as I can respond, and I appreciate the question, that the sanctions, not the finding of contempt, can vary. Let me be sure I understand you on this. So, this has very little to do with the merits of the fraud action. It has to do with the fact that a Cyprus court entered a disclosure and freeze order, and you're saying that she didn't comply with it, and you're entitled to the evidence to prove that. That's correct. That's the adjudicative proceeding? Let me ask you to tell me how, if at all, the following concerns might inform any decision we make. That kind of a disclosure and freeze order would not be obtainable in a United States court, right? That's correct. Agreed. And you basically want us to order that kind of discovery from a woman who is now a United States citizen for possible use, not on a merits determination, but on a contempt in a proceeding that could not be held in a United States court. Is that where we are here? That's correct. And why should we do that? A couple of reasons, Your Honor. The adjudicative proceeding, that is at issue, is the entire Cyprus proceeding. I think there's been some confusion in the briefing that Gorsan was required to delineate. You just said to me that the reason this is being sought is for contempt on an order that can't be obtained in the United States, that the United States does not allow the government to proceed in that way or allow private parties to proceed in that way. So, I want to be very clear. We're not obviously looking to have a federal court freeze Ms. Bullock's assets. You're looking to have a federal court require her to make disclosures for a Cyprus proceeding that she couldn't be ordered to make in a U.S. proceeding. And that happens in Section 1782 proceedings, right? There are certain proceedings that are ongoing abroad that aren't contemplated in the U.S. And we, out of principles of comedy, out of principles of efficiency, we provide that discovery. So, the question is, to what extent is 1782 designed to let us do or require us to do, with respect to foreign proceedings, what would happen here? And to what extent instead is it simply to do whatever these other courts might want to do, even though it couldn't be done here? Now, has any of the broadening of 1782, to which I adverted earlier, gone to this latter thing? That is, I thought that the broadening in 1782 all went to make it more like what discovery is going to be for Americans in American cases. Respectfully, I don't think this is a broadening. I think that we have precedent within the circuit. I'm looking at the Aldenate case from 1993 that has always allowed the identification of assets, and that's the Chilean competency proceeding. And the determination from this court was that... But at what stage, at what stage was the merits litigation there? That was ongoing, Your Honor. Well, but it was in connection with that. It wasn't a predetermination freeze order like we've got here. And just to throw another fact in the mix, I mean, you talked about comedy. Cyprus is not the site of this fraud. Cyprus jurisdiction was chosen precisely because Cyprus would enter this kind of an order. And so to that extent, it doesn't seem to me that we have quite the same scenario as if the site of the injury was looking to vindicate rights that had been violated in that country. I don't think we have in the record the rationale. I mean, we have forum shopping here. I don't believe that's in the record before us. I think that the site of Cyprus... I thought it was submitted that the entity was created in Cyprus purely to be the litigation vehicle. Did I misunderstand that? In the district court, that argument said that Ms. Bullock and the respondents were not able to substantiate that allegation of bad faith. And that was one of their arguments that they made around the intel factors. Okay, I don't want to pursue that, but let me let you make your argument. No, I appreciate the question. And I sort of return back to the sort of general view of 1782. 1782 has long in the Second Circuit allowed for the discovery of assets like this. The district court, and I want to be really clear about what the district court actually found here because I think it matches well with those precedents. She said that the court is satisfied with Gorson's explanation that it has the ability to introduce the requested information in the Cyprus court and is likely to drive a benefit with consequences for the entire litigation from doing so. And again, this is what we're able to do with the freezing and disclosure order. I see my time is nearly up. If the court will indulge, I'll address the Fifth Amendment concerns. Otherwise, I'll rest on the briefs. No, go ahead. You can address the Fifth Amendment. I think there's a threshold issue that needs to be that respondents did not meet, and that's the risk of incrimination. And that was the first issue the district court took up. The district court found that it was conclusory, that it was speculative and remote, and that they did not substantiate what the actual risk to them was. Right now, in the appellant's briefs, we're seeing the specificity around the money laundering, you know, that this is the actual risk they faced. At the district court, that wasn't what we heard. In a series of briefs, we heard only, we have a Fifth Amendment right, we're represented by counsel, we understand the contours of the right, basically take us at our word. And that's not sufficient, and that's what the judge rested on. The question of the act of production privilege and whether or not they're going to be required to, you know, to then make out that privilege on a document-by-document basis, or if they're allowed to sort of make the blanket assertion that they did, that you only come to if they're able to say, this is what the risk is. And this is why I just want to sort of underscore this point. There's a dispute between the parties on the standard of review. And the standard of review that we cited as an abuse of discretion threshold, excuse me, an abuse of discretion standard, the standard they cite is de novo. But I believe, and I think this is borne out in the case law, that the standard is abuse of discretion when we're actually looking at what the district court determined with respect to that sort of initial threshold question. Are there the facts? Do the circumstances actually support the risk of incrimination? On that issue, the district court said no. In their reply brief in the district court, they say, oh, look, Gorson's declarant said it could be used to, as part of, to prove this fraudulent scheme in Cyprus. The court explicitly said, I disagree. So on the question of the Fifth Amendment, we'd submit that the respondents failed to make even the baseline showing that they needed, and that we don't even need to approach the question of whether the act of production privilege needs to be asserted on a document by document or on a blanket basis. Thank you, Your Honor. Unless there are any further questions, I'll rest. Thank you. We'll hear the rebuttal. Who's going first? Ms. Shapiro? You're on mute. I apologize, Your Honor. Just two quick points. Number one, I think we heard yet again that the purpose of the discovery really has nothing to do with the underlying fraud. And although counsel went into a long spiel about the ways in which any evidence that they might derive from these subpoenas could theoretically strengthen any contempt motion, none of that was brought before the district court. In fact, the district court record on the Cyprus law issue consists entirely of a single paragraph from the Cyprus lawyer's declaration that my adversary referred to. It's at page appendix 309. And in that paragraph, he simply recites at a highly general level that a party's failure to comply with a court's interim order may lead to various legal consequences and so forth. Ms. Shapiro, help me out before your time is up. Assume that we don't think this has anything to do with the merits of the underlying fraud. Why isn't a proceeding about the compliance with a court order not an adversarial proceeding for which 1782 discovery can be sought? I mean, obviously, if your adversary moves for contempt, your client is going to fight that. It's going to be adversarial. That's right, Your Honor. And just to be clear, and I think we acknowledge this in our reply brief, we're not taking the position that 1782 discovery could never be had in connection with a real concrete, within reasonable contemplation, contempt motion. We're not contending that. We're contending that on this record, in which we have the purported noncompliance, which was eight years old, as Your Honor pointed out, and indeed there was a finding from the district court in connection with the 2013 subpoena as early as 2014, consistent with their repeated assertions that Ms. Bullock did not comply with the discovery order that was available. So really, we're not saying this could never happen. We're saying in this case, it's way too speculative, way beyond what we have in certain funds, and that really, particularly in light of the point that we made and that Your Honor commented on with regard to the Mareva injunction and United States policies, it's going to open the floodgates to any foreign litigant who happens to have a Mareva injunction coming to this court. The only other point I wanted to make, Judge Chin, if you'll indulge me very, very quickly, just the Aldunate case is completely distinguishable. That wasn't about an effort to identify assets to enforce a Mareva injunction or a judgment. It was a proceeding in which the applicant sought to be appointed as guardians in a Chilean court, and the Chilean court said that in order for it to make an adjudicative ruling granting this application, it needed the information that was sought pursuant to the 1782. Thank you, Your Honor. Thank you.  Thank you, Your Honor. Two quick break points in rebuttal. First, you heard Gorsun's counsel argue that respondents did not meet a threshold requirement risk of incrimination, but here we briefed the Fifth Amendment issues before the district court. We pointed to a very specific criminal statute that was implicated, and that's the same statute that was then again cited on appeal, and Gorsun's papers itself reveal the risk to respondents. And you just heard Ms. Donovan say, talk about Bullitt's efforts to, quote, alienate assets. The clear implication is witnesses that would hold documents about those assets and those assets hiding efforts would be implicated in the alleged wrongdoing against Bullitt. We came to a hearing before Judge Abrams ready to talk and answer, talk about the Fifth Amendment and answer her inquiries. And I would just note that the Supreme Court in Hoffman made very clear that district courts are required to play an active role in sussing out whether or not there's a basis for the privilege and to take note of particularities of the case beyond the facts actually in evidence. And just one final note, I think it's important to remember what the act of production protects. It's the existence or the possession of documents. And I think Greenfield makes this clear, the Supreme Court's decision, and Hubbell makes this clear. We would urge the court to adopt Ms. Shapiro's arguments in reverse on the statutory grounds. But if it reaches the Fifth Amendment issues, we think it's very clear that given the document-by-document process that the district court mandated, that that decision would not leave respondents' Fifth Amendment rights intact. Thank you. Thank you. Thank you all for your arguments. We'll reserve decision.